IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

William J. Thomas,                         Case No. 3:17 CV 2130

           Plaintiff,                    MEMORANDUM OPINION
                                           AND ORDER
-vs-
                                           JUDGE JACK ZOUHARY
Christine M. Dykstra, et al.,

           Defendants.

### INTRODUCTION

This action was removed from state court (Doc.1). Pending before this Court are Defendants Christine and Steven Dykstra's Motions to Dismiss for Lack of Personal Jurisdiction under Federal Civil Rule 12 (b)(2) (Docs. 3, 4). Plaintiff William Thomas filed a Combined Opposition (Doc. 7). The Dykstras filed separate Replies (Docs. 8, 9), and a joint Surreply (Doc. 11). After an evidentiary hearing, this matter is now decisional.

### BACKGROUND FACTS

The facts of this case are somewhat unique: Thomas is the father of Christine Dykstra, and the father-in-law of Steven Dykstra. Although there are disputed facts, they primarily relate to liability rather than this Court's personal jurisdiction. Here are the undisputed facts, drawn from the Complaint (Doc. 1-2), the Dykstras' affidavits (Docs. 3-1, 4-1), and the evidentiary hearing (Docs. 10, 13; Hearing Transcript).

The Dykstras reside in Florida, after moving there in 2015–16 from Texas (Doc. 3-1 at 1; Doc. 4-1 at 1). Neither Defendant has resided or worked in Ohio for over twenty-five years, and their only

contact with Ohio during that time was the occasional phone call, e-mail, and visit to Christine's family members (Doc. 3-1 at 1; Doc. 4-1 at 1). The only alleged contacts relevant to this dispute are a few phone calls between Christine and her father, and a few e-mails between Christine and her sisters (Doc.1-2 at ¶¶ 2–5; Doc. 3-1 at 1–2).

In late 2015, Christine reached out to her father about relocating to Florida due to concerns about her mother's health and his ability to care for her without assistance (Doc.1-2 at ¶¶ 2–3; Doc. 3-1 at 1). Christine made the call after she and her sisters discussed their concerns about their parents and possible care arrangements, ultimately agreeing that the best option was to propose they join Christine and her family in Florida (Doc. 3-1 at 1). During the call with her father, Christine allegedly promised to help care for her parents and build her father a woodworking shop once he arrived in Florida (Doc.1-2 at ¶¶ 4–5). In exchange, her parents would contribute to the purchase of the Florida home from the sale proceeds of their Ohio home (*id.* at ¶ 5; Doc. 3-1 at 1). There is no allegation that Steven participated in these discussions, other than generally agreeing that his wife's parents could move in with his family.

Three weeks later, Thomas called Christine to inform her he had decided to make the move (Doc. 3-1 at 1). In early 2016, he sold his Ohio home and most of his personal belongings without any input from his children and, in fact, contrary to Christine's suggestion that he wait until her family completed their move to Florida to avoid having to relocate twice (Doc.1-2 at ¶ 6; Doc. 3-1 at 1–2). Thomas and his wife then joined Christine in Texas before all parties moved to Florida (Doc.1-2 at ¶ 7; Doc. 3-1 at 2).

Although the exact details are unclear, at some point Christine and her father opened a joint bank account. Steven was not named on the account (Doc.1-2 at ¶ 5; Doc. 13-1 at 1). The Complaint

2

alleges Christine requested an account be opened "to help with the expense of housing her parents" (Doc.1-2 at ¶ 5), while Christine says the account was created because her father did not want to continue writing checks or tracking his bills (Doc. 3-1 at 2). Regardless of its exact intended purpose, the account was clearly opened in Texas (*id.* at 2; Doc. 13-1 at 1), and money was not withdrawn from it until after Thomas resided in Texas (*see* Doc. 13-1; Tr. at 5–7). Eventually, $109,674.05 from this account was transferred to the Sun Trust Bank to help purchase the Florida home (Doc 1-2 at ¶ 8; Tr. at 3).

All parties agree their relationship declined *after* the parties resided together in Florida (Doc 1-2 at ¶ 9; Doc. 3-1 at 2). As promised, Thomas was provided a residence with his woodworking shop (Doc. 3-1 at 2). The parties dispute why, and upon whose insistence, Thomas left Florida. Unbeknownst to his daughter or son-in-law, Thomas returned to Ohio and then filed this lawsuit (*id.* at 2–3). Thomas claims unjust enrichment and promissory estoppel. He does not allege fraud or misrepresentation.

## STANDARD OF REVIEW

Thomas carries the burden of demonstrating that jurisdiction is proper "over each defendant independently." *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 904 (6th Cir. 2006). Thomas has not submitted his own affidavit, but relies on the allegations in the Complaint, the Dykstras' affidavits, and bank records provided at this Court's request.

The exact burden placed on Thomas depends on whether an evidentiary hearing was held. When no evidentiary hearing is held, only a prima facie showing of personal jurisdiction is required, and the pleadings and affidavits are viewed in the light most favorable to the plaintiff. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002). But when an evidentiary hearing is

3

held, the plaintiff must establish jurisdiction by a preponderance of the evidence. *Youn v. Track, Inc.*, 324 F.3d 409, 417 (6th Cir. 2003). This Court heard arguments and evidence at a Record Phone Hearing on February 2, 2018. Thus, Thomas must establish this Court's jurisdiction by a preponderance of the evidence.[1]

## DISCUSSION

Because this is a diversity case, Thomas must satisfy the state-law requirements for personal jurisdiction. *Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 361 (6th Cir. 2008). Ohio's long-arm statute does not extend to the full reach of the Due Process Clause. *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000) (citing *Goldstein v. Christiansen*, 70 Ohio St. 3d 232, 238 n.1 (1994) (per curiam)). Thus, this Court must separately analyze whether the exercise of personal jurisdiction is both (1) authorized by the laws of Ohio and (2) in accordance with due process. *Estate of Thomson*, 545 F.3d at 362.

**Ohio Long-Arm Statute**

Here, Thomas argues the Dykstras are subject to Ohio's long-arm statute under Ohio Revised Code § 2307.382(A)(1), which authorizes personal jurisdiction over a non-resident defendant when the cause of action arises from the defendant "[t]ransacting any business" in Ohio. The Ohio Supreme Court has interpreted "transacting" broadly:

> "Transact," as defined by Black's Law Dictionary (5 Ed.1979) 1341, " * * * means to *prosecute negotiations;* to carry on business; *to have dealings* * * *. The word embraces in *its meaning the carrying on or prosecution of business negotiations* but it is a *broader term than the word 'contract' and may involve business negotiations* which have been either wholly or partly brought to a conclusion * * * .

---

[1] Even if the less strenuous standard applied, the facts alleged in this case are insufficient to establish a prima facie case of personal jurisdiction over either Defendant.

4

*Ky. Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 53 Ohio St. 3d 73, 75 (1990) (emphasis and omissions in original).

Because of this amorphous language, cases under the provision are resolved on "highly particularized fact situations, thus rendering any generalization unwarranted." *U.S. Sprint Commc'ns Co. v. Mr. K Food's, Inc.*, 68 Ohio St. 3d 181, 185 (1994) (citation omitted). Courts typically consider two factors: (1) whether the defendant initiated the "business dealing," and (2) whether the parties conducted their negotiations in Ohio or with terms affecting Ohio. *Shaker Constr. Grp., LLC v. Schilling*, 2008 WL 4346777, at *3 (S.D. Ohio 2008) (quoting *Paglioni & Assocs., Inc. v. Winnercomm, Inc.*, 2007 WL 852055, at *9 (S.D. Ohio 2007)). *See also Ashwood Comput. Co., Inc. v. Bluegrass Area Dev. Dist.*, 2016 WL 1028263, at *4–5 (S.D. Ohio 2016); *Ricker v. Fraza/Forklifts of Detroit*, 160 Ohio App. 3d 634, 639–40 (Ohio Ct. App. 2005). In addition, the plaintiff must demonstrate there is a "substantial connection" between the defendant and the forum state. *Shaker Constr. Grp.*, 2008 WL 4346777, at *3 (citing *U.S. Sprint*, 68 Ohio St. 3d at 185).

### *Steven Dykstra*

Thomas does not allege Steven had any direct contact with Ohio. The Complaint states *Christine* called her father, *Christine* made the alleged promises, and *Christine* was to be named on the joint account (Doc. 1-2 at ¶¶ 2–5). Thomas contends that Christine's contacts with Ohio should be imputed to Steven because he "agreed with [his] wife . . . that [they] should ask her elderly parents if they would like to move to Florida with [them]" (Doc. 4-1 at 1; Tr. at 10–11). In support, Thomas cites *AgriSales Dynamix, LLC v. RECON Technologies, LLC*, 2012 WL 13027094 (W.D. Mich. 2012), and *Stolle Machinery Co. v. RAM Precision Industries*, 2011 WL 6293323 (S.D. Ohio 2011). *See also* Tr. at 10–11.

Although these cases support the general proposition that an agent's contacts with a forum may be imputed to the principal, they are easily distinguishable from this case. In *AgriSale Dynamix*, the court imputed an individual's contacts to a company with which he had a formal consulting relationship. *AgriSales Dynamix*, 2012 WL 13027094, at *3–4. The court concluded that because the company had contracted with the individual to "derive benefits from his ongoing Michigan contacts," it could not "disclaim those same contacts" to limit personal jurisdiction. *Id.* at *4. *Stolle Machinery* involved a misappropriation of trade secrets claim. The court found an agency relationship existed between a company and its CEO because the CEO allegedly stole the trade secrets at issue and then used them to establish the company. *Stolle Mach.*, 2011 WL 6293323, at *3–4, *7–8. The company subsequently ratified its CEO's conduct by "knowingly using those trade secrets . . . for its own financial gain." *Id.* at *8. Both *AgriSale Dynamix* and *Stolle Machinery* involved developed business relationships and companies that ratified the other party's contacts by intentionally misusing the information gleaned from the contacts for their own benefit. Neither of these factors is present in this case.

Steven did not create an agency relationship with his wife by merely agreeing that his wife's parents could move in with their family. And, when prompted, Thomas offered no other argument or evidence suggesting an agency relationship existed. Thus, because Thomas has not alleged Steven had *any* direct contacts with Ohio, this Court lacks jurisdiction under both the Ohio long-arm statute and the Due Process Clause.

### *Christine Dykstra*

As for Christine, this Court finds her contacts with Ohio do not satisfy Section 2307.382(A)(1). Despite Ohio courts' broad interpretation of "transacting," this Court is skeptical that the conversations in this case constitute "business" negotiations or a "business" dealing. The extent of the alleged contacts are a few phone calls between a daughter and her father making arrangements for his relocation to Florida, and a few e-mails between sisters about their concern for their parents' well-being and their desire to offer assistance. These conversations were between private individuals -- family members. And although the conversations had financial implications, Thomas does not suggest Christine's proposal was motivated by pecuniary gain or made in bad faith. The type of discussions alleged do not constitute "business" under the ordinary understanding of the word, and do not naturally fit within the statutory language or the Ohio Supreme Court's definition of "transacting."

Further, when asked to provide analogous case law extending Section 2307.382(A)(1) to discussions of this nature, Thomas provided one case: *Ramsier v. Western & Southern Life Ins. Co.*, 518 N.E.2d 615 (Ohio Ct. of Comm. Pl. 1987). But *Ramsier* is easily distinguishable from the facts here. *Ramsier* involved a suit against a woman by the administrator of her deceased brother's estate. *Id.* at 616. Unlike Christine, the woman made several trips to Ohio to "perform services in respect to [her brother's] personal property": she met with the administrator several times in person, purchased items at her brother's estate auction, and signed a paper obligating her to pay her brother's funeral expenses. *Id.* at 616–17. The woman's out-of-state actions also allegedly caused injury in Ohio. *Id.* at 617. Here, Thomas does not allege Christine was ever present, caused injury, or had any contractual obligations in Ohio. Although not dispositive, the lack of case law applying this provision to similar relationships or discussions supports the conclusion that this was not a "business" transaction.

7

However, even if these discussions are considered "business" dealings, Christine's alleged contacts still fail under the long-arm statute. The first consideration is who initiated the dealing, or whether the non-resident defendant "reached out" to the forum to create a "business relationship." *McMunigal v. Bloch*, 2010 WL 2106186, at *3 (N.D. Ohio 2010) (citation omitted). Again, this analysis is a bit strange when applied to the relationship here. Nevertheless, after discussing the potential arrangement with her sisters, Christine did reach out to her father to suggest he and his wife relocate to Florida.

But the parties' discussions did not occur in Ohio. Thomas and Christine communicated by phone, and Christine and her sisters communicated by e-mail. Thomas does not allege his daughter was ever in Ohio during the relevant period. "[M]ere communications to an Ohio resident are insufficient to constitute 'transacting business' within the meaning of the Long–Arm statute." *Id.* at *4.

And Thomas' relocation did not materially affect Ohio and does not demonstrate Christine has a "substantial connection" to the state. The parties' future relationship and obligations all point away from Ohio: Thomas was to contribute funds to help with housing and other expenses *in Florida*, his woodworking shop was to be built *in Florida*, and Christine was to assist her parents *in Florida*. Thomas and Christine's joint bank account was also created out of state, in Texas (Doc. 3-1 at 2; Doc. 13-1; Tr. at 4–7). Money was not withdrawn from the account until both parties were in Texas (*see* Doc. 13-1; Tr. at 2–4, 6–7). Although Thomas did sell property in Ohio, he does not allege Christine played any role in the sale, nor does he dispute that he "placed his house for sale . . . without telling any of his children. He negotiated with a realtor and also an auctioneer" (Doc. 3-1 at 1–2). The alleged agreement simply does not contemplate or create *any* ongoing obligations to Ohio.

Christine's only connection to Ohio is her family. She made contacts solely because her father and one of her sisters happened to reside in Ohio, not because she wished to create any "substantial connection" with the state. *See McMunigal*, 2010 WL 2106186, at *4 ("Finally, Plaintiff has failed to demonstrate that there is a 'substantial connection' between Defendant and the forum state. The communications from Defendant to Plaintiff in Ohio regarding the Aspen agreement happened solely because Plaintiff happens to reside in Ohio, not because the Defendant wished to create any kind of 'substantial connection' with the state."). *See also Calphalon Corp.*, 228 F.3d at 722–23 ("[I]n *International Technologies Consultants v. Euroglas*, 107 F.3d 386, 395 (6th Cir. 1997), we found it 'purely fortuitous' that the foreign defendant-seller had any contact with Michigan. The defendant was not attempting to 'exploit any market for its products' in the state of Michigan, but rather had contact with the state only because the plaintiff chose to reside there.").

In addition, the long-arm statute requires Christine's contacts with Ohio to be the "proximate cause" of Thomas' cause of action and alleged injury, a "tighter" relationship than required under the Due Process Clause. *Brunner v. Hampson*, 441 F.3d 457, 465–66 (6th Cir. 2006). Even construing the alleged facts in favor of Thomas, his claims and alleged injuries were not directly caused by Christine's contacts with Ohio, but by later conduct in Texas and Florida. The Dykstras did not receive any "benefit" until Thomas was in Texas (Doc. 1-2 at ¶ 8; Doc. 13-1), and the parties' relationship did not decline until all resided in Florida (Doc. 1-2 at ¶ 9) ("After the move to Florida, the situation rapidly declined . . . .").

**Due Process**

Although this Court is not required to address the due process analysis once it has found jurisdiction lacking under Ohio's long-arm statute, *Conn v. Zakharov*, 667 F.3d 705, 713 (6th Cir.

2012), personal jurisdiction also fails under that analysis for similar reasons. The "bedrock principle" of the due process analysis is that a non-resident defendant must have such "minimum contacts" with the forum so that "the maintenance of the suit [there] does not offend 'traditional notions of fair play and substantial justice.'" *Youn*, 324 F.3d at 417 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Sixth Circuit has adopted a three part test for determining whether due process is satisfied:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir.1968).

The first requirement "is arguably the most important," and is the only prong this Court will address. *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 550 (6th Cir. 2007). Purposeful availment occurs when a non-resident defendant takes action creating a "substantial connection" with a forum such that she can "reasonably anticipate being haled into court there." *Neogen Corp.*, 282 F.3d at 889 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). The requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous' or 'attenuated' contacts.'" *Burger King*, 471 U.S. at 475 (citations omitted).

Although phone calls directed to a forum *may* constitute purposeful availment when "those communications form the 'heart' of the cause of action," *Neal v. Janssen*, 270 F.3d 328, 332–33 (6th Cir. 2001), cases applying this standard usually involve deceptive communications, or communications giving rise to an intentional tort. *See, e.g., id.*; *Schneider v. Hardesty*, 669 F.3d 693, 702–03 (6th Cir. 2012); *Redhawk Glob., LLC v. World Projects Int'l*, 2012 WL 6032951, at *7 (S.D. Ohio 2012). *See*

*also Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 451 (6th Cir. 2012). Even the existence of a contract with an Ohio party does not automatically establish purposeful availment. Courts will consider additional factors, such as "prior negations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Burger King*, 471 U.S. at 479; *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 680 (6th Cir. 2012) (discussing Sixth Circuit cases finding no purposeful availment despite letters, phone calls, or even contracts with forum residents when no ongoing obligations to the forum were created). After all, as courts have repeatedly stated, it is the *quality* of the contacts with the forum which is important. *E.g.*, *LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1301 (6th Cir. 1989).

Here, Christine's only alleged contacts with Ohio are a few phone calls and e-mails to her family members, made in good faith and with the goal of creating a relationship in Florida. These contacts, and the contemplated future consequences of those contacts, are not of such quality that she could "reasonably anticipate being called into court" in Ohio. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *Burger King*, 471 U.S. at 478–79. Thus, this Court's exercise of personal jurisdiction over the Dykstras would not comport with due process.

## CONCLUSION

For all of the foregoing reasons, this Court finds it does not have personal jurisdiction over the Dykstras. Defendants' Motions to Dismiss (Docs. 3 & 4) are granted. The case is dismissed.

IT IS SO ORDERED.

                                                s/ *Jack Zouhary*
                                                JACK ZOUHARY
                                                U. S. DISTRICT JUDGE

                                                February 14, 2018